RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0292P (6th Cir.)
File Name: 03a0292p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

OVERTON DISTRIBUTORS,
INC.,
*Plaintiff-Appellee,*

v.

HERITAGE BANK,
*Defendant-Appellant.*

No. 02-5261

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-00284—John T. Nixon, District Judge.

Argued: July 29, 2003

Decided and Filed: August 15, 2003

Before: GILMAN and GIBBONS, Circuit Judges;
JORDAN, Senior District Judge.*

---

\* The Honorable R. Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

---

### COUNSEL

**ARGUED:** Richard L. Colbert, COLBERT & WINSTEAD, Nashville, Tennessee, for Appellant. Stephen P. McCarron, McCARRON & DIESS, Washington, D.C., for Appellee. **ON BRIEF:** Richard L. Colbert, W. Gregory Miller, J. Frank Rudy, Jr., COLBERT & WINSTEAD, Nashville, Tennessee, for Appellant. Stephen P. McCarron, McCARRON & DIESS, Washington, D.C., for Appellee.

---

### OPINION

---

RONALD LEE GILMAN, Circuit Judge. Overton Distributors, Inc. supplied produce to Quality Foods of Tennessee, Inc. between 1993 and 2000. Quality went out of business in January of 2000, leaving an unpaid debt to Overton of over $220,000 for produce purchased between October of 1999 and January of 2000. Overton now seeks to recover this unpaid debt from Heritage Bank, Quality's lender, by invoking the statutory trust provisions of the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. §§ 499a-499t, a statute enacted in 1930 to regulate the sale of perishable agricultural commodities.

In 1996, Quality entered into an agreement with Heritage Bank that allowed Quality to obtain advances against the value of its accounts receivable. Approximately 90% of these accounts receivable arose from the sale or resale of produce covered by PACA. The owners of Quality filed a Chapter 7 bankruptcy petition in July of 2000. This caused Overton to sue Heritage to recover its losses, contending that the bank's agreement with Quality constituted a breach of Overton's statutory trust, and that the bank had received the proceeds of

Overton's produce that were subject to the PACA trust provisions.

In ruling on the parties' cross-motions for summary judgment, the district court held that Overton had properly preserved its statutory trust benefits under PACA, leaving the other issues for resolution at trial. The district court subsequently ruled for Overton following a two-day bench trial, concluding that the agreement between Quality and Heritage constituted a breach of Overton's statutory trust. Overton, in the court's opinion, was thus entitled under PACA to assert a superior claim to the proceeds from the sale of its produce that were acquired by Heritage from Quality. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** with instructions to dismiss Overton's complaint.

## I. BACKGROUND

### A. Factual background

In late 1993, shortly after Overton began selling produce to Quality, it sent a letter to Quality providing that the latter would pay Overton's invoices within 10 days of a 15-day accrual cycle. That is, all of the invoices were to be paid within 25 days of Quality's receipt of the produce. Charlain Jarman-Hall, one of the principals of Quality, countersigned the letter and returned it to Overton in early 1994. For the next four years, Overton's invoices to Quality reflected these payment terms. Then, in 1998, Overton's invoices to Quality were unilaterally changed to provide that payment was to be received within 10 days after the end of each calendar month in which produce was delivered. Cathy Grossman, Overton's director of Business Development, changed the payment terms because Quality's payments were typically late and subject to her boss's criticism. Overton's invoices at this time also contained the following statement:

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a claim over these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

Quality consistently paid Overton on an irregular and tardy basis, often taking between 40 and 60 days to pay an invoice. Overton regularly called Quality about its slow payments on the account, but it never required Quality to strictly abide by any specific terms of payment. Grossman testified that Overton tolerated Quality's late payments because Overton thought that Quality would eventually pay.

Heritage provided banking services to Quality throughout the latter's existence. For many of the years in which it conducted business, Quality had difficulty making its payments, often writing checks on insufficient funds that Heritage covered. Quality entered into a financing arrangement with Heritage in 1996 called the Business Manager Agreement (BMA). The BMA provided for the sale of Quality's accounts receivable to Heritage, with Heritage advancing Quality payment for those receivables, less a 2.5% service charge. But the BMA contained numerous provisions limiting Heritage's exposure. Quality, for example, remained liable for all of the advances it received from Heritage should the proceeds from the accounts receivable not cover the amount of the funds advanced. Heritage could also reassign any account receivable to Quality in case of default, it could debit any of Quality's accounts without notice to pay any deficiencies, and it could demand that Quality pay any shortfall to the bank. Finally, the BMA contained a blanket security interest on all of Quality's assets and a representation that Quality's receivables were free and clear of all security interests, liens, and claims of third parties.

In January of 2000, Quality went out of business, leaving Overton with more than $220,000 in produce delivered to Quality for which Overton had never been paid. Heritage, which had acquired the accounts receivable from Quality's resale of the produce, became the focus of Overton's attention.

## B.  Statutory background

One of the purposes of PACA is to protect unpaid sellers of perishable agricultural commodities. In 1984, Congress amended PACA to create a statutory trust in their favor. 7 U.S.C. § 499e(c); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995) ("[D]ue to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in any position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify."). The trust protects the sellers against financing arrangements made by merchants, dealers, or brokers who encumber or give lenders a security interest in the commodities or the receivables or proceeds from the sale of the commodities, thus giving the claims of these sellers precedence over those of secured creditors.

The statute and the federal regulations expressly lay out the steps that a produce seller must take to come within PACA's protection. 7 U.S.C. § 499e(c)(3) and (4); 7 C.F.R. §§ 46.2(aa) and 46.46(e). Under all circumstances, the seller must give the buyer written notice of the seller's intention to preserve its trust benefits. Congress further amended PACA in 1995 by allowing sellers to provide this notice on the invoices given to the buyer. If the seller and the buyer use the default payment terms provided in the regulations ("within 10 days after the day on which the produce is accepted"), this notice of intent to preserve benefits is all that is necessary. On the other hand, if the parties agree to payment terms greater than 10 days after acceptance, but in no event more

than 30 days after acceptance, this agreement must be in writing. The seller must also disclose these non-statutory payment terms "on invoices, accountings, and other documents relating to the transaction." 7 U.S.C. § 499e(c)(3); 7 C.F.R. § 46.46(e)(1).

Thirty days is the maximum allowable payment term under PACA regulation 7 C.F.R. § 46.46(e)(2), which provides as follows: "The maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities . . . ." This limitation exists because the statute is intended to protect only those produce sellers making short-term credit arrangements. H.R. Rep. No. 98-543 at 7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410 ("[T]he committee does not intend the trust to apply to any credit transaction that extends beyond a reasonable period.").

## C.  Procedural background

Because Quality was insolvent, Overton sued Heritage to recover the amount of its unpaid invoices owed by Quality. Overton maintained that it had properly preserved its claim to trust benefits under PACA, that the BMA between Quality and Heritage constituted a breach of the PACA trust, and that Overton was therefore entitled to recover from Heritage. Heritage responded by arguing that Overton had not properly preserved its trust benefits, and that, even if it had, the BMA represented a bona fide sale of the accounts receivable to the bank, not a security interest that would allow Overton to claim priority over these funds.

The district court, in partially granting Overton's motion for summary judgment, found that Overton had properly preserved its PACA trust benefits. A two-day bench trial followed to resolve the remaining issues. In an order dated January 7, 2002, the district court concluded that the BMA constituted a breach of the trust. The court also held that

Heritage's bona-fide-purchaser defense was without merit. It therefore ordered Heritage to pay Overton the full amount due from Quality plus prejudgment interest. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

Heritage appeals both the district court's bench-trial decision and its order granting partial summary judgment to Overton. "In considering a district court's decision following a bench trial, this court reviews findings of fact under the clearly erroneous standard. Conclusions of law, on the other hand, are reviewed *de novo*. We also review *de novo* the district court's grant of summary judgment." *Burzynski v. Cohen*, 264 F.3d 611, 616 (6th Cir. 2001) (internal citations omitted).

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must construe all reasonable factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. The district court erred in concluding that Overton had preserved its trust benefits pursuant to the provisions of PACA

In early 1994, Quality confirmed the payment terms of 10 days within a 15-day accrual by countersigning and returning Overton's letter that set forth this understanding. Thus, in

compliance with PACA, payment was due within the 30-day maximum allowed by the regulations. In addition, Overton included on all of the relevant invoices a statement of its intention to preserve its PACA trust benefits. Overton failed, however, to place the payment terms as agreed to in the 1994 written agreement on these invoices. Instead, the payment terms on all invoices from 1998 forward were "10 days EOM," establishing that the payment was due within 10 days after the end of each calendar month in which produce was delivered. Because payments for produce delivered on the first of the month could be made as late as 40 days after the date of acceptance, the invoices indicated that Overton was agreeable to a payment schedule outside of PACA's protection.

Overton presented two alternate theories to avoid the consequences of its failure to comply with PACA's requirements: (1) the very fact that the parties' 1994 agreement and the payment terms on the relevant invoices differ indicates that the agreement was ambiguous and, as a result, no agreement at all; and (2) the different terms on the invoices were the result of a clerical error, and that Overton should be given the benefit of the doubt due to its good faith effort to substantially comply with PACA.

In order to bring Overton within the statute's protection, the district court adopted both of the above theories. It used the 1998-2000 invoices to find ambiguity in the unambiguous 1994 writing expressing the parties' agreement, and it examined the record as a whole to give Overton the benefit of the doubt. But the statutory language is quite clear. Absent a written agreement altering the payment terms set in 1994, all of the subsequent invoices from Overton to Quality were required to disclose the agreed terms of payment. 7 U.S.C. § 499e(c)(3); 7 C.F.R. § 46.46(e)(1).

The parties had clearly agreed in 1994 to terms different from the standard 10-day payment provision contained in the

PACA regulations. Consequently, PACA and the regulations mandate that those terms had to be disclosed on the invoices. Overton cannot have it both ways. It cannot, on the one hand, list terms on its invoices that are not only different from those mutually agreed upon, but also permit payment outside of PACA's requirements, and then on the other hand argue that it has substantially complied with PACA.

There are no Sixth Circuit cases dealing with the preservation of trust benefits under PACA. The two cases from other circuits relied on by the district court deal with oral agreements that extended the payment terms beyond the standard 10-day statutory provision. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197 (3d Cir. 1998) (holding that PACA's requirement that an agreement to extend the payment period be in writing relates to the enforceability of an agreement to extend a payment term, but does not disqualify an unpaid seller from receiving trust benefits); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777 (8th Cir. 1991) (holding that oral agreements between produce sellers and buyers as to payment terms beyond the standard 10 days after delivery had no effect on the seller's right to trust protection under PACA). The statute, however, imposes strict disclosure obligations relating to written agreements that extend the payment terms, and there is no dispute about the contents of the parties' 1994 agreement. As a result, these cases provide little guidance for the situation presented here.

The Ninth Circuit case of *Bowlin & Son, Inc. v. San Joaquin Food Service, Inc.* (*In re San Joaquin Food Service, Inc.*), 958 F.2d 938 (9th Cir. 1992), presented facts more analogous to those before us. In *Bowlin*, the parties had a written agreement that extended the payment terms beyond the standard 10-day statutory provision, but the seller failed to include these terms on its invoices. *Id.* at 939. The court held that the benefits of the trust were lost. *Id.* at 940. The *Bowlin* court also held that the seller's argument that it had substantially complied with the statute failed. *Id.* at 940

("Unless the terms of the statute are met, [PACA] specifies that the benefits of the trust are lost."). We agree with the Ninth Circuit's analysis.

Overton argues that the 1998-2000 invoice-payment terms are an alteration that rendered the earlier agreement ambiguous or void. As previously indicated, however, we find no factual or legal support for Overton's position. Its alternative contention that the incorrect terms were placed on the invoices due to a clerical error is also without merit. Overton's Director of Business Development testified that the change extending the payment term was made in 1998 because Quality's payments were typically late. This was consistent with Overton's practice of not requiring Quality to abide by any specific terms of payment, which often was received 40 to 60 days after invoice. Overton was of course free as a business matter to provide lenient payment terms to Quality, but by doing so it failed to preserve its trust benefits under PACA. 7 U.S.C. § 499e(c)(3); 7 C.F.R. § 46.46(e)(2).

Even though the payment terms included on the relevant invoices had the effect of requiring payment within thirty days on shipments that happened to be made after the tenth day of the prior month, Congress's purpose in enacting PACA was to protect sellers delivering their produce on essentially cash terms, not to provide protection to sellers who are willing to extend payment terms beyond the statutory maximum. *See Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1, 12 (1st Cir. 1999) (Selya, J. dissenting) ("Those courts that have addressed claims involving payment terms of more than thirty days uniformly have held PACA inapplicable on the ground that the thirty-day maximum period is to be imposed as written."). This interpretation has the significant commercial advantage of putting third parties such as Heritage on notice as to whether or not the invoice-payment terms themselves make the produce sale in question subject to PACA trust protection, without the onerous requirement of having to ascertain the precise delivery date of each particular

shipment. Furthermore, in the case before us, Overton neither argued that we should ascertain individual delivery dates nor made any effort to segregate deliveries made within the first 10 days of each billing cycle from those made thereafter.

Because Overton's 40-day maximum payment term failed to preserve its trust benefits under PACA, it is not entitled to assert priority over Quality's accounts receivable that arose from the sale of Overton's produce. We therefore have no reason to resolve the issue of whether Quality's BMA with Heritage was in fact only a security interest in Quality's accounts receivable or whether Heritage was a bona fide purchaser for value of those accounts.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** with instructions to dismiss Overton's complaint.