NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0339n.06

No. 12-5659

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 08, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SIX L'S PACKING CO., INC., | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES ERIC BEALE; JAMES R. BEALE, dba Sunfresh Farms, | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| Defendant-Appellants, | ) MIDDLE DISTRICT OF TENNESSEE |
| | ) |
| and | ) |
| | ) |
| J.E. BEALE PRODUCE, INC.; KATTIA MARIA BISCHOFF-BEALE; SUNFRESH FARMS, INC.; SUNFRESH, INC., | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

Before: CLAY, COOK, and ROTH, Circuit Judges.[*]

COOK, Circuit Judge. Six L's Packing Co. ("Six L's") sued James R. Beale d/b/a Sunfresh

Farms ("JR Beale" or "Sunfresh") and salesman James Eric Beale ("JE Beale" or "salesman Beale")

under the Perishable Agricultural Commodities Act ("PACA" or "Act"), 7 U.S.C. §§ 499a-499t.

Sunfresh appeals the district court's grant of summary judgment to Six L's, as well as its denial of

_____

[*]The Honorable Jane R. Roth, Senior Circuit Judge for the United States Court of Appeals
for the Third Circuit, sitting by designation.

No. 12-5659
*Six L's v. JR Beale, et al.*

Sunfresh's PACA-based counterclaim. JE Beale appeals the district court's judgment against him

individually under the Act. We AFFIRM the district court's grant of summary judgment to Six L's

and its denial of Sunfresh's counterclaim, but REVERSE its individual liability judgment.

I.

*A. The Parties*

As licensed PACA merchants, Six L's and Sunfresh buy and sell fresh produce. 7 U.S.C. §§

499a-499d. JR Beale runs Tennessee-based Sunfresh with his son, JE Beale, as his salesman. Within

certain pre-set limits, salesman Beale could buy and sell produce without obtaining his father's

approval. Salesman Beale does not, however, own an interest in Sunfresh or issue invoices on its

behalf; he also lacks signatory authority for the company's accounts.

When ordering tomatoes from Six L's, salesman Beale would usually email Six L's sales

representative, Carlo Laporta, the quantity of tomatoes for purchase, a pick-up date from Six L's

warehouse in Immokalee, Florida, and a numbered Purchase Order ("PO"). Six L's would then place

the reserved quantity of gas-green tomatoes[1] into a ripening room for up to eight days before pick-up.

The market value of the produce on the pick-up date set the contract price.

---

[1] In commercial practice, produce suppliers use ethylene—a tasteless, odorless gas produced by many types of produce, including tomatoes—to hasten and ensure the tomatoes' uniform ripening.

Six L's preprinted invoices included the statement: "All sales FOB no grade contracts. PACA good delivery standards apply." PACA "good delivery standards" require that, upon reaching their destination, no greater than 15% of tomatoes exhibit defects (such as bruising or discoloration). 7 C.F.R. § 46.44.

## B. Six L's Unpaid Invoices

### 1. Invoice #242127

In November 2009, JE Beale ordered 1,178 cases of tomatoes from Six L's with an invoice totaling $26,629.10 (invoice # 242127). A truck picked up the shipment at Six L's loading dock in Immokalee on December 1 and delivered the produce to Sunfresh's customer, General Produce, Inc. ("GPI"), in Atlanta. GPI received and accepted the produce on December 2, but reported some problems with 640 cases of Florida Silk tomatoes. That same day, GPI requested a USDA inspection of the tomatoes, which occurred within the hour. Per Sunfresh and GPI's instructions, USDA inspectors examined only the 640 boxes of Florida Silks, as GPI had already sold the rest of the order. The USDA inspection certificate, which listed the shipment status as "unloaded," reported a 23% "checksum."[2] Asserting breach of contract, Sunfresh proposed to pay $17,701.10 rather than the invoiced $26,629.10. Six L's rejected this offer.

---

[2]The defect average is called the "checksum."

*2. Invoices #242380 and #242381*

On December 1, 2009, before the GPI load problems devolved into an invoice dispute, JE Beale emailed Laporta, placing two orders on Sunfresh's behalf: one for 800 cases of "Silk" tomatoes (PO #17523), and a second for 400 cases of "Velvet" tomatoes (PO #17524). The salesmen's email exchange did not include a pick-up date. Seven days later, JE Beale sent another email to Laporta, directing him to "keep [Sunfresh's] orders cool" because his "original customer backed out today." Two days later, Sunfresh picked up 240 of the 800 Silk cases and 160 of the 400 Velvet cases, paying Six L's the December 8 price per case: $23.95 (Silk) and $21.95 (Velvet). Four days after the partial pick-up, Six L's warned Sunfresh that it would hold the remaining 800 cases of tomatoes for two more days. When Sunfresh failed to pick up the produce, Six L's resold the tomatoes at a case rate 12 dollars below the contract price (Silks at $11.95 and Velvets at $9.95 per case), billing Sunfresh for the difference. Invoices #242380 and #242381, charging Sunfresh $6,720 and $2,880 for the Silks and Velvets, reflect those charges.

*3. Invoice #243406 and Settlement Attempts*

Six L's final invoice (#243406) concerns a December 21, 2009 order for 360 cases of green bell peppers. Sunfresh admits that it owes Six L's the full invoice amount for this purchase, and further reports that it attempted to settle its account when it offered partial payment for the other three disputed transactions. Specifically, on November 4, 2010, Sunfresh's attorney sent a letter to Six L's counsel, along with a check for $13,915.10. Sunfresh agreed to pay the $1,614 owed for the

bell peppers, $17,701.10 for the $26,629.10 invoice, and nothing for the abandoned tomatoes. It deducted $5,400 that Six L's allegedly owed on Sunfresh's invoice #17204, resulting in its settlement offer of $13,915.10. Six L's returned the check, refusing partial repayment.

*C. Sunfresh's Invoice*

Sunfresh's counterclaim stems from a sale of 54 cantaloupe bins to Six L's (invoice #17204). The parties agree that Six L's never paid for the order, but dispute nearly everything else related to the sale. Six L's instructed Sunfresh to send the produce directly to its customer, Ryeco, LLC ("Ryeco"). Though Ryeco took delivery of the cantaloupes on May 25, 2009, it marked "Rec'd under Protest" on the bill of lading. Six L's offers four documents as proof that after Ryeco received the produce under protest, it resold the cantaloupes and relayed the proceeds to Six L's: a copy of the USDA inspection of 50 out of the 54 cantaloupe bins, reporting a 17% checksum; a copy of its invoice to Ryeco for $2,160.00;[3] a check from Ryeco for $2,100; and a shipping invoice dated May 28, 2009 for $2,300.

*D. Procedural History*

Six L's filed its original complaint against JR and JE Beale in December of 2010. In June 2011, Six L's agreed to drop the claims against salesman Beale, so long as JR Beale, the principal, agreed to promptly satisfy any damages the district court deemed appropriate. The following month,

---

[3]Six L's deducted $60 from the invoice, totaling $2,100.

Six L's moved for partial summary judgment. Sunfresh responded, counterclaimed for the cantaloupes, and moved for summary judgment on its counterclaim, teeing up the entire controversy for the district court.

The district court ruled in Six L's favor, holding Sunfresh liable for the four unpaid invoices, plus attorney's fees and interest, and rejecting Sunfresh's counterclaim for the unpaid cantaloupe invoice. The court denied JR Beale's motion for reconsideration. After Sunfresh refused to pay the damages award, Six L's revived its claims against JE Beale and moved for summary judgment against him on the four unpaid invoices. The court granted that motion, holding JE Beale personally liable for the unpaid orders. After the court denied JE Beale's motion for reconsideration, the Beales filed this appeal.

II.

*A. Standard of Review*

We review the grant of summary judgment de novo, affirming if the facts, viewed in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), reveal that no genuine issue of material fact exists and Six L's is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 373-74 (6th Cir. 2009). We likewise give fresh review to the district court's grant of reasonable attorney's fees, to the extent they hinge on matters of contract interpretation. *Progressive Foods, LLC v.*

No. 12-5659
*Six L's v. JR Beale, et al.*

*Dunkin' Donuts, Inc.*, 491 F. App'x 709, 712 (6th Cir. 2012) (citing *Adkins v. Chrysler Fin. Corp.*, 344 F. App'x 144, 147 (6th Cir. 2009)); *see also Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008).

*B.  Six L's Preserved its PACA Trust Rights*

We first consider Sunfresh's defense that PACA's reach cannot extend to invoices #242380 and #242381, because Sunfresh never took delivery of those tomatoes.  The district court disagreed, reasoning that the Act's protection does not turn on physical possession of the produce.  Thus, it concluded that Six L's preserved its trust rights by reciting the required language under 7 U.S.C. § 499e(c)(4) in each of its invoices.  We agree.

PACA provides a comprehensive regulatory scheme for the sale of produce in interstate commerce.  "Under the Act, when a seller, dealer, or supplier ships produce to a buyer, a statutory trust is created upon acceptance of the commodities."  *Golman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000); *see also* 7 U.S.C. §§ 499a-499t.  The trust protects sellers against buyers' financing arrangements by giving sellers priority over secured creditors.  To invoke the Act's protection, sellers must provide buyers written notice of their intention to preserve trust rights.  7 C.F.R § 46.46(f)(1); *Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003).  In 1995, Congress amended the Act, allowing sellers to meet this notice requirement by including the  appropriate statutory language on "ordinary and usual billing or invoice statements." 7 U.S.C. § 499e(c)(4); 7 C.F.R § 46.46(f)(3); *see also Overton*, 340 F.3d at 365.

Though not questioning Six L's notice, Sunfresh charges that the Act only activates when a commission merchant "received" the produce, 7 U.S.C. § 499e(c)(2), thereby requiring that Six L's show Sunfresh took "actual or constructive possession" of the produce to fall under the Act's purview. As the district court correctly pointed out, however, the statutory term "received" encompasses not only possession, but also "ownership [and] control." 7 C.F.R. § 46.46(a)(1). Sunfresh gained ownership and control over the trust assets (the produce) once the tomatoes were harvested, gas-ripened, and stored at its behest. Through JE Beale, Sunfresh instructed Six L's salesman to "keep [Sunfresh's] orders cool," thereby controlling not only the location of the tomatoes but also their stage in the ripening process. Sunfresh presents no evidence to dispute this determination, and we agree with the district court that Six L's notices triggered PACA's protections.

*C. Six L's Unpaid Invoices*

*1. Invoice #242127 ($26,629.10)*

Sunfresh maintains that it justifiably withheld payment for invoice #242127—a 1,178-case shipment of tomatoes—because they were defective. The district court disagreed, determining that Sunfresh's acceptance of the produce foreclosed rejection.

PACA makes it unlawful for any licensed merchant to "fail or refuse . . . [to] make full payment promptly" in connection with the sale of produce. 7 U.S.C. § 499b(4). The regulations define "full payment promptly" as "[p]ayment for produce purchased by a buyer, within 10 days after

the day on which the produce is accepted," though merchants may agree in writing to extend this period up to 30 days. 7 C.F.R. § 46.2(aa)(5) (setting 10-day standard repayment terms); *id.* § 46.46(e)(2) (allowing 30-day extension). The statute also prohibits a dealer from rejecting "without reasonable cause any perishable agricultural commodity bought or sold or contracted to be bought, sold, or consigned . . . by such dealer." 7 U.S.C. § 499b(2). "Reject[ion] without reasonable cause" includes "any rejection following an act of acceptance." 7 C.F.R. § 46.2(bb). And "acceptance" means "[a]ny act . . . signifying acceptance of the shipment, including diversion or unloading." *Id.* § 46.2(dd)(1).

The undisputed record satisfies us that Sunfresh accepted the produce in question. For one, Sunfresh's customer unloaded and sold at least 46% of the shipment before ordering an inspection. What is more, the USDA certificate lists the shipment status as "unloaded." Finally, Sunfresh's pleadings repeatedly admitted that its customer "accepted" all 1,178 cases of tomatoes. Sunfresh now disputes that it accepted the goods, but its admissions foreclose this argument. *See Ferguson v. Neighborhood Hous. Serv.*, 780 F.2d 549, 551 (6th Cir. 1986).

Sunfresh's alternative argument—that even if it accepted the shipment it should have been allowed to revoke this acceptance—also lacks merit. Sunfresh forfeited this argument by neglecting to raise it below. *See Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, 667 F.3d 669, 681 (6th Cir. 2011). And in any event, Sunfresh meets none of the statutory requirements for revocation. It provided no evidence to show that the produce's defects "substantially impair[ed] [their] value," or

that "difficulty of discovery" or "the seller's assurances" prevented timely rejection of the goods. Tenn. Code. Ann. § 47-2-608(1)(b).[4]  Finally, Sunfresh argued that it should be able to deduct its damages from the invoiced debt.  But, having raised the argument for the first time in its Rule 59(e) motion, Sunfresh forfeited it as well.  *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996) ("[Plaintiff] raised the issue for the first time in his motion to alter or amend the judgment. Thus, he failed to preserve the issue for appeal."), and the district court correctly declined to issue a ruling on the matter.

### 2.  Invoice #242380 ($6,720) and #242381 ($2,880)

Turning to Six L's claim for the partially delivered shipment of tomatoes, invoices #242380 and #242381, Sunfresh argues the parties never reached agreement on the sale.  But the uncontroverted evidence—consisting of emails, invoices, and JE Beale's own admissions—supports the existence of a binding contract.  Challenging the district court's conclusion to this effect, Sunfresh insists that the parties did not reach an agreement because the December 1 orders omitted the price term.  The district court disagrees, and so do we.

A sales contract may still be enforceable, even if it lacks a price term:

---

[4]The parties assume that the UCC as enacted in Tennessee governs certain aspects of this case, likely because Sunfresh operates out of Lebanon, Tennessee. Since Florida has adopted the same UCC provisions, and the parties do not suggest otherwise, we do likewise.

> In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price; or (b) the price is left to be agreed by the parties and they fail to agree; or (c) the price is to be fixed in terms of some agreed market or other standard.

Tenn. Code. Ann. § 47-2-305(1).[5]

Though Laporta and JE Beale's email exchanges made no mention of price, the parties customarily priced the order a week after placement—allowing time for the tomatoes to ripen. Accordingly, Six L's set the price for the December 1 order using the market values for tomatoes on December 8. Thus, when Sunfresh picked up the 240 cases of Silk and 160 cases of Velvet tomatoes on December 10, it paid the December 8 price for each. Sunfresh now argues it was picking up a different order on December 10, one placed that same day. It further contends that JE Beale's email directing Laporta to "keep [his] orders cool" also pertains to that future order. The record belies this claim. JE Beale's email predates the December 10 orders by two days. Sunfresh offers no evidence to account for this temporal discrepancy. Further, the instructions in the email—to *keep* the orders

---

[5]Sunfresh also asserts that because the Tennessee Code goes on to state that "acceptance does not of itself impair any other remedy provided by this chapter for nonconformity," Tenn. Code. Ann. 47-2-607(2), it is permitted to recover damages from the non-conformity of the tender. *See id.* § 47-2-714. Not only did Sunfresh forfeit this claim by raising it for the first time in its Rule 59 motion, *Thurman v. Yellow Freight Systems, Inc.*, 97 F.3d 833, 835 (6th Cir. 1996), but it misunderstands how the PACA and state contract law interact, *Genecco Produce, Inc. v. Sandia Depot, Inc.*, 386 F. Supp. 2d 165, 171 (W.D.N.Y. 2005) ("The Uniform Commercial Code ('UCC') applies to sales of produce under PACA, where PACA is silent as to a material part of the transaction at issue.") (quotation marks omitted) (applying New York State's codification of the UCC). PACA specifically addresses the issue of rejection after acceptance.

cool—runs counter to the parties' past conduct, ripening tomatoes in heated storage for seven days before cooling them for transport.

Even assuming, for argument's sake, that the December 10 pick-up involved a different order, Sunfresh would still owe Six L's for the December 1 orders. Sunfresh sidesteps this issue by arguing that where "the parties intend not to be bound unless the price be fixed or agreed and it is not . . . there is no contract." Tenn. Code Ann. § 47-2-305(4). Yet Sunfresh offers no evidence to suggest the parties used price as a precondition to agreement. Quite the opposite, the parties recognized the risks associated with their variable price-fixing methods by using "lid" prices and other forms of market protection. These measures offset the inherent difficulties of transacting under variable pricing conditions, effectively undercutting Sunfresh's claim that the parties' used pricing as a precondition to agreement.

Finally, Sunfresh objects to the commercial reasonableness of the resale, contending that Six L's sold the remaining produce on the cheap. Given the depressed tomato market around the time of the resale, charging $11.95 for the Silks and $9.95 for the Velvets—amounting to 100% and 83% of the USDA-reported prices, respectively—was reasonable. Plus Six L's had to resell the produce about a week past its intended pick-up date, likely affecting quality. Sunfresh fails to present evidence genuinely disputing Six L's resale prices.

*D. Sunfresh's Counterclaim: Invoice #17204*

Sunfresh counterclaimed for $7,020,[6] stemming from its sale of 54 cantaloupe bins to Six L's. Six L's replied that Sunfresh breached the terms of the contract by delivering faulty produce—over the 15% checksum. Though Sunfresh does not deny its produce exceeded the defect limits, it argues Six L's accepted the lot, foreclosing rejection. The district court, finding that Six L's received the order under protest and resold the produce at a loss to cover Sunfresh's breach, concluded that Six L's owed Sunfresh nothing.

The record amply supports the district court's conclusion. Rather than accept the produce on arrival, Six L's customer—unlike GPI—clearly marked the driver's bill of lading "Rec[eive]d under protest," and even gave the reason for rejection: "crushed bins." A party performing under an "explicit reservation of rights . . . does not thereby prejudice the rights reserved." Tenn. Code. Ann. § 47-1-308(a). "Such words as 'without prejudice', 'under protest', and the like are sufficient. *Id.*; *see also id.* cmt 1 (echoing key language "under protest" as sufficiently reserving a party's rights pending resolution of a dispute). Thus, a party may "go[] ahead with delivery, acceptance, or payment" without foregoing any rights retained by the qualifying language. *Id.* cmt 1. Thus, contrary to Sunfresh's assertions, Six L's receipt of the produce does not preclude its rejection upon inspection.

---

[6]Alternatively, Sunfresh claimed Six L's owed the $5,400 price listed in the invoice for the cantaloupes.

The USDA inspection confirmed that 50 out of the 54 bins exhibited 17% defects, which, even accounting for the four uninspected bins, exceeded the USDA threshold. JE Beale's email to Six L's salesman, Adam Homan, also supports this conclusion. Having preserved the right to reject the nonconforming goods, Six L's customer resold the produce on Sunfresh's account. Tenn. Code Ann. § 47-2-603(1) (noting that, absent instructions from seller, a buyer "is under a duty after rejection of goods in his possession . . . to make reasonable efforts to sell them for the seller's account if they are perishable"). Six L's expended $2,300 shipping the defective cantaloupes to its resale customer, which was $200 more than the resale value of the produce. Sunfresh fails to present evidence creating a genuine issue of fact regarding Six L's rejection or resale prices.

*E. Attorney's Fees*

The district court concluded that Six L's had a contractual right to attorney's fees, given the invoice provision: "Buyer agrees to pay all costs of collection including attorneys' fees and costs . . . in the event collection action becomes necessary." It also noted that PACA likewise may provide a basis for recovering attorney's fees. On appeal, Sunfresh's only argument is that, because it offered to settle for a reasonable amount, this suit is unnecessary and renders the fee-shifting provision unenforceable. Sunfresh's contention lacks merit, as Six L's had no obligation to accept Sunfresh's check for an amount well below the original contract prices. Because the contractual provision forms the basis for awarding Six L's attorney's fees, we need not decide whether PACA

alone supports the claim. The district court reserved judgment on the fee amount pending this appeal; we thus leave it to the court, upon a renewed motion, to determine a reasonable fee.

*F. JE Beale's Liability*

The district court held JE Beale personally liable under PACA, concluding that he was "in a position to control the assets of the PACA trust and [failed] to preserve them." Though we agree with the district court that certain classes of individuals face personal liability as trustees under the Act, we cannot agree with its conclusion that JE Beale falls into that class.[7]

"Individual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles." *Weis-Buy Servs. v. Paglia*, 411 F.3d 415, 421 (3d Cir. 2005) (citing *Sunkist Growers v. Fisher*, 104 F.3d 282, 282 (9th Cir. 1997)). Applying these trust principles, our sister circuits unanimously agree PACA imposes individual liability on corporate officers, shareholders, and others, to the extent that they control the trust assets. *See, e.g.*, *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705-06 (2d Cir. 2007); *Weis-Buy*, 411 F.3d

---

[7]We also note that even if we found JE Beale faces personal liability, it is still unclear that summary judgment would be appropriate on this issue, because nothing in the record suggests JE Beale dissipated funds necessary to cover the purchased produce. The creation of the PACA trust was meant to protect sellers, and the obligations imposed on buyers are therefore quite stringent. As the district court found, any use of trust assets for any purpose, besides re-paying the seller, can be a dissipation, and a Plaintiff need only show that the assets held by the buyer could not cover the debt in order to show that dissipation. *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 707 (2d Cir. 2007). Though Six L's correctly argues that tying up the funds in litigation might constitute a breach of duty, it must still demonstrate that at some point JE Beale had less cash available for immediate payment than he owed under the trust.

at 421; *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 667-68 (7th Cir. 2002); *Golman-Hayden Co.*, 217 F.3d at 351; *Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1, 9 (1st Cir.1999); *Sunkist Growers*, 104 F.3d at 283; *Red's Mkt. v. Cape Canaveral Cruise Line, Inc.*, 181 F. Supp. 2d 1339, 1343-44 (M.D. Fla. 2002), *aff'd*, 48 F. Appx 328, 2002 WL 2001204 (11th Cir. 2002) (table).

A panel of this court recently adopted this position in *Arava USA, Inc. v. Karni Family Farm, LLC*, 474 F. App'x 452 (6th Cir. 2012). In that case, Arava, a distributor of fresh produce, sued Karni Farm and its president, Mati Karni, under the Act. The district court dismissed the suit against Karni, holding that the Act did not authorize individual liability. We reversed, concluding that "individual shareholders, officers, or directors of a corporation who are in a position to control statutory trust assets, and who fail to preserve those assets, may be held personally liable under the Act." *Arava*, 474 F. App'x at 453 (citing *Sunkist*, 104 F.3d at 283). Nothing in *Arava* or previous circuit decisions suggests that we should extend PACA-liability to individuals who are not shareholders, officers, or directors of a corporation. By emphasizing the individual's position of control over the company—as a shareholder, officer, or director—*Arava* points to a different outcome in this case. *Id.*

Unlike the individual defendant in *Arava*, who was the president of the PACA merchant, JE Beale is neither an officer nor a director of Sunfresh. He owns no Sunfresh stock, has never occupied a position comparable to that of a corporate officer or director, and reviews none of

Sunfresh's financial reports. In fact, much like the officer absolved of liability in *Bear Mountain Orchards*, *Inc. v. Mich-Kim, Inc*, 623 F.3d 163 (3d Cir. 2010), JE Beale lacked check-signing authority and financial control over Sunfresh.

The district court focused on the fact that JE Beale had some leeway in making purchasing decisions on behalf of Sunfresh. Yet buying and selling produce on another's behalf is not the control contemplated by these cases. Even so, the record shows that JR Beale restricted his son's purchasing discretion. On these facts, we cannot conclude that JE Beale had the requisite control over the trust assets to justify holding him personally liable, and we reverse this aspect of the district court's judgment.

III.

We AFFIRM the district court's grant of summary judgment to Six L's on the disputed invoices, the attorney's fees, and the denial of Sunfresh's counterclaim. We REVERSE the court's judgment against JE Beale.