**NOT RECOMMENDED FOR PUBLICATION**
File Name: 21a0062n.06

No. 20-1048

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re: SPIECH FARMS, LLC,

     Debtor.

_____

PRODUCE PAY, INC.,

     Plaintiff-Appellant,

v.

SPIECH FARMS, LLC,

     Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jan 29, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

BEFORE: BOGGS, DONALD, and THAPAR, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Produce Pay, Inc. ("Produce Pay") appeals the bankruptcy court's decision to deny its claim brought under the Perishable Agricultural Commodities Act ("PACA" or "Act"), 7 U.S.C. §§ 499a-499s, against Spiech Farms, LLC ("Spiech"). Produce Pay attempted to use the Act to guarantee that it had complete access to Spiech's assets, but the bankruptcy court found that Produce Pay neither qualified as a seller or supplier of commodities nor purchased Spiech's accounts receivables, and consequently held that Produce Pay was ineligible for relief through its PACA claim. The district court affirmed, and Produce Pay now seeks to reverse the bankruptcy court's decision. For the reasons set forth below, we AFFIRM the bankruptcy court's judgment.

I.

Spiech grows and processes blueberries, asparagus, and grapes. Prior to 2017, Spiech significantly relied on Chemical Bank to finance its business operations. Chemical Bank paid over $4 million to Spiech through loans and a line of credit over a period of a few years. In exchange for its financial support, Chemical Bank received first-priority mortgage liens and security interests in substantially all of Spiech's assets.

In early 2017, Spiech fell on hard times after losing its blueberry crop due to frost. This loss caused Spiech to turn to the "multi-service finance company," Produce Pay, in an attempt to increase its cash flow. Spiech and Produce Pay entered into a "Distribution Agreement" ("Agreement") that allowed Spiech to obtain short-term loans from Produce Pay as a partial advance on payments that Spiech was supposed to receive from its existing customers. The Agreement additionally presented Spiech with the opportunity to gain new customers by listing its produce on Produce Pay's software platform.

Pursuant to the Agreement, there was a specific sequence of events that transpired. First, Spiech notified Produce Pay that it had a pallet of produce "for sale" by registering that pallet on Produce Pay's software platform. Next, Produce Pay would decide if it wanted to "buy" that produce from Spiech for half the market price. If Produce Pay was inclined to "purchase" the produce, Spiech assigned "all right, title and interest" in that produce to Produce Pay.

Though the produce listed on Produce Pay's platform was "for sale," this language was used in an unusual way. The parties agree that each pallet report—which described instances of Spiech communicating to Produce Pay that it had a new pallet of produce available *for sale*—stated that the produce had already been shipped and delivered to Spiech's customers prior to Spiech making note of a new pallet on the platform. When Produce Pay "bought" produce from

Spiech, that signified that Produce Pay was willing to lend Spiech money, with the expectation that Spiech could repay Produce Pay after Spiech was compensated by the customers who actually purchased the produce. Moreover, at no point during this process did Produce Pay take physical possession of any produce that Spiech originally obtained and sold to its customers.

Regardless of whether Spiech's customers made timely payments or not, Spiech was required to repay the money it received from Produce Pay, as well as a "commission" (in effect, interest), within 30 days of receipt. Per the Agreement, Produce Pay was entitled to an increased commission if Spiech sold the produce to new customers that it had acquired through the system. The commission rate also increased after 30 days. After 60 days, Spiech was obligated to "repurchase" the produce from Produce Pay by "repaying" the purchase price in addition to a commission.

Although Produce Pay seemingly could benefit by contracting with Spiech, Produce Pay was fully aware that if Spiech did not comply with the terms of the Agreement, Produce Pay's ability to pursue legal action against Spiech would be somewhat limited because Spiech had mortgaged its assets to Chemical Bank—including Spiech's produce and accounts receivables. Produce Pay was unfazed by Spiech's commitments to Chemical Bank because Produce Pay assumed that its share of the proceeds from the produce would be secured by a PACA trust. If Produce Pay was correct, its rights to Spiech's assets would be superior to those held by Chemical Bank. Unfortunately, Produce Pay's gamble proved to be costly.

In early September 2017, Chemical Bank learned that Produce Pay had filed a financing statement against Spiech on September 1, 2017—exactly one day after Spiech and Produce Pay entered into the Agreement. Chemical Bank subsequently expressed its concerns to Spiech about Produce Pay's financing statement because the loan agreement between Spiech and Chemical

Bank prohibited Spiech from granting any additional security interests in its property. Following communications in which Spiech explained to Chemical Bank that it was selling produce to Produce Pay, Spiech revealed to Chemical Bank that it believed Produce Pay might be entitled to PACA protections. Spiech's disclosure led Chemical Bank to believe that Produce Pay was intentionally trying to circumvent its security interests in Spiech's assets. Chemical Bank then declared Spiech in default and removed funds from Spiech's deposit account.

While Spiech was dealing with its issues with Chemical Bank, its relationship with Produce Pay was simultaneously deteriorating. By about November 2017, Spiech no longer had the funds to repay Produce Pay. This was due, at least in part, to its default status under its loan agreement with Chemical Bank.

After realizing it could no longer continue its operations, Spiech filed for Chapter 11 bankruptcy relief in the Western District of Michigan. During the bankruptcy proceedings, Produce Pay made a PACA claim against the bankruptcy estate and sought $1,002,273.70 to recover the cash advances it made to Spiech. The bankruptcy court held an evidentiary hearing and denied Produce Pay's claim, concluding that Produce Pay did not "sell" or "supply" perishable agricultural commodities under 7 U.S.C. § 499e(c)(2) because it never physically possessed or acquired title to Spiech's produce since Spiech already sold and delivered the produce. Additionally, the bankruptcy court ruled that the Agreement did not indicate that Produce Pay could purchase Spiech's accounts receivables or Spiech's rights as a PACA trust beneficiary. The district court later affirmed the bankruptcy court's holding.

Produce Pay now appeals the bankruptcy court's judgment, as well as its decision to grant Spiech the right to recover professional and attorney's fees.

II.

A.

This Court reviews the bankruptcy court's decision, and not the district court's decision below. *In re Lee*, 530 F.3d 458, 463 (6th Cir. 2008). A de novo standard of review applies to the bankruptcy court's legal conclusions, while factual findings will only be disturbed if they are clearly erroneous. *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 607 (6th Cir. 2000).

Congress enacted PACA in 1930 to regulate the sale of perishable agricultural commodities. *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir. 1995). In 1984, Congress amended PACA to create a statutory trust to protect those who sold or supplied such commodities but went unpaid. *Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 364 (6th Cir. 2003). The 1984 amendment, in relevant part, provides that:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). "Under the Act, when a seller, dealer, or supplier ships produce to a buyer, a statutory trust is created upon acceptance of the commodities." *Six L's Packing Co. v. Beale*, 524 F. App'x 148, 152 (6th Cir. 2013) (quoting *Golman–Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000)). The trust effectively protects commodity sellers and suppliers against harm from financing arrangements entered into by buyers (merchants, dealers, and brokers) who give "security interest[s] in [their] commodities or the receivables or proceeds from the sale of the commodities." *Overton Distributors*, 340 F.3d at

365. And thus, under § 499e(c)(2), these sellers and suppliers' rights are superior to those of the buyers' other creditors.

The Court first addresses whether Produce Pay was a "seller" or "supplier" of Spiech's produce. Since PACA does not define either term, we must give those terms their plain meanings. *See, e.g.*, *Keeley v. Whitaker*, 910 F.3d 878, 882 (6th Cir. 2018) (citing *Taniguchi v. Kan Pac. Saipan*, *Ltd.*, 566 U.S. 560, 566 (2012)). A "seller" is "someone who sells or contracts to sell goods" and transfers "property in a contract of sale." *Black's Law Dictionary* (11th ed. 2019). A "supplier" is a seller, manufacturer, or "anyone else in the chain who makes the product available to the consumer." *Id.*

The bankruptcy court looked to state law to resolve the dispute between the parties.[1] As the bankruptcy court correctly acknowledged, under the Uniform Commercial Code ("U.C.C."): (1) title can only pass *after* goods to a contract are identified; (2) title must pass *before* goods are delivered; and (3) delivery only occurs when a document of title is provided by the seller. U.C.C. § 2-401(1),(3). When the U.C.C. is taken into consideration, it becomes evident that Produce Pay never had title to any of Spiech's produce, and therefore could not be a seller or supplier of such produce. This is because the U.C.C. embodies the maxim *nemo dat qui non habet*, meaning that he cannot confer what he does not possess. *See City of Chicago v. Morales*, 527 U.S. 41, 90 n. 9 (1999) (Scalia, J., dissenting); *United States v. Harris*, 246 F.3d 566, 575 (6th Cir. 2001). First, the Agreement did not explicitly identify what produce would be sold, and Produce Pay only learned what produce was "for sale" after it was registered on its platform. Second, by the time Produce Pay "bought" the produce, it was already delivered to

---

[1] The Court turns to the U.C.C. because the Agreement contains a Delaware choice of law provision, which is relevant because Delaware has adopted Article 2 of the U.C.C. *See Miley v. Harmony Mill Ltd. P'ship*, 803 F. Supp. 965, 968 (D. Del. 1992).

Spiech's customers. Third, Produce Pay did not receive a document of title until it was too late—after a customer possessed the produce.

Produce Pay responds to the bankruptcy court's application of the U.C.C. by contending that PACA preempts state laws. The Act states that it does not "abrogate nor nullify any other statute, whether State or Federal, dealing with the same subjects of this chapter . . . [and] all such statutes shall remain in full force and effect except insofar only as they are inconsistent herewith or repugnant hereto." 7 U.S.C. § 499o. Produce Pay fails to offer a valid reason as to why PACA preempts the U.C.C. Its only argument is that the U.C.C. "stands as an obstacle" to the operation of a trust and must be inconsistent with the Act. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). PACA protects sellers and suppliers of certain commodities, and the U.C.C. can only be used to interpret the words of PACA defining those who are protected by the Act. Therefore, there is no conflict between PACA and § 2-401 of the U.C.C.

Produce Pay additionally contends that even if it was not a "seller" or "supplier" of Spiech's produce, it was assigned "all right, title and interest" to Spiech's produce that it purchased under the Agreement. Thus, its status as an assignee made Produce Pay the buyer of Spiech's accounts receivables, which implicitly included the right to protection as a PACA trust beneficiary. Spiech responds by arguing that because the risk of any losses remained with Spiech, the relevant transactions under the Agreement constitute loans, not sales; therefore, Produce Pay did not purchase Spiech's produce, and Produce Pay was not entitled to the rights deriving from purchasing Spiech's produce or Spiech's accounts receivables. The bankruptcy court addressed Produce Pay's argument and found it unavailing, determining that Spiech did not

transfer its accounts receivables to Produce Pay under the terms of the Agreement. The Court agrees with the bankruptcy court.

Since this issue is one of first impression in this circuit, we look to other circuits for guidance. In similar instances, other circuits—including the Second, Fourth, Fifth, and Ninth—have applied the "transfer-of-risk test" to determine whether the contractual relationship between two parties was one involving a seller and a buyer or a secured lender and a debtor. *See S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 808 (9th Cir. 2018) (en banc); *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 600–603 (4th Cir. 2010); *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 414–16 (5th Cir. 2003); *Endico Potatoes*, 67 F.3d at 1068–69; *see also Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir. 1979).[2] The transfer-of-risk test entails examining several factors, such as:

> [1] the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt.

*Endico Potatoes*, 67 F.3d at 1068. Moreover, as the court in *Endico Potatoes* explained:

> Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender

---

[2] Produce Pay asserts that the Court should not apply the transfer-of-risk test because in these cases, the circumstances were dissimilar from those in the present case. In those cases, courts applied this test to assess whether a buyer of agricultural commodities breached its responsibilities as a PACA trustee. However, the Court finds it is appropriate to perform the transfer-of-risk analysis in the instant case since it is being used here as it was in the other cases, with the objective being to resolve parties' contentions regarding their contractual relationship. Furthermore, Produce Pay does not convincingly explain why the Court should abstain from engaging in such analysis.

only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Id.* at 1069.

After considering the terms of the Agreement, the Court finds that Spiech did not sell Produce Pay its accounts receivables because Produce Pay assumed no risks associated with collecting on the receivables. Spiech was tasked with collecting the receivables and relinquishing half of the related proceeds to Produce Pay—even if Spiech's customers defaulted on their financial obligations. If Spiech did not remit the proceeds to Produce Pay within 30 days, Spiech was responsible for paying Produce Pay an increased "commission." Thus, Produce Pay was not burdened by the account debtors' (Spiech's customers) non-payment; in fact, Produce Pay profited in such a scenario. Furthermore, the Agreement expressly states:

> Receivables Risk. [Spiech] shall bear all default risk of any purchaser of the Produce. As such, [Spiech] shall compensate [Produce Pay] based on the first invoiced Gross Sale Proceeds even if a grocer, retailer or other purchaser or end user defaults on payment after having taken possession of the Produce.

Therefore, based on the plain terms of the Agreement, it is difficult to dispute that the transactions between Spiech and Produce Pay are best characterized as loans, not true sales—in other words, Spiech did not assign its accounts receivables or PACA rights to Produce Pay.

Accordingly, Produce Pay's PACA claim fails.

B.

Produce Pay also seeks reversal of the bankruptcy court's order authorizing payment of Spiech's professional and attorney's fees. Because the bankruptcy court's order was neither "final," since it did not terminate the bankruptcy proceeding, *see In re Jackson Masonry, LLC*, 906 F.3d 494, 499 (6th Cir. 2018), nor an interlocutory order that was properly certified and accepted, *see In re Lindsey*, 726 F.3d 857, 858 (6th Cir. 2013), the Court can only evaluate the

merits of Produce Pay's contention pertaining to such fees if we discretionarily exercise pendent jurisdiction over this claim. *See Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998) ("The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction."). While the parties disagree as to whether the Court should exercise pendent jurisdiction, both parties concede that if we determine that Produce Pay's PACA claim is unsuccessful, Produce Pay's claim regarding the payment of fees also fails. Therefore, in light of our above determinations, Produce Pay's claim regarding Spiech's ability to recover professional and attorney's fees is denied.

## III.

For the foregoing reasons, we AFFIRM the bankruptcy court's denial of Produce Pay's PACA claim. We also AFFIRM the bankruptcy court's decision authorizing payment of fees.