19-3540-cv
S. Katzman Produce Inc. v. Yadid

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2020

(Argued:  January 19, 2021                    Decided: June 9, 2021)

Docket No. 19-3540-cv

_____

S. KATZMAN PRODUCE INC., and KATZMAN BERRY CORP.,

*Plaintiffs-Appellees*,

- v. -

ELIRAN YADID,

*Defendant-Appellant*,

OREL PRODUCE, INC. t/a MOSES, and MOSHE YADID,

*Defendants*.*

_____

Before:  KEARSE, LEVAL, and LOHIER, *Circuit Judges*.

---

*The Clerk of Court is instructed to amend the official caption to conform with the above.

Appeal by defendant Eliran Yadid from so much of a judgment of the United States District Court for the Southern District of New York, Paul A. Crotty, *Judge*, as orders him, jointly and severally with his codefendants Orel Produce, Inc. t/a Moses ("Orel"), *et al.*, to pay plaintiffs, suppliers of perishable goods, a total of $606,664.87, including principal amounts totaling $473,268.82, plus interest and attorneys' fees, by reason of Orel's failure to pay plaintiffs for goods purchased, and the dissipation of the statutory trust imposed on Orel's assets for the benefit of unpaid suppliers, in violation of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.* The court granted plaintiffs' motion for summary judgment holding Eliran liable on the ground that he was a person in control of the trust assets. *See S. Katzman Produce, Inc. v. Orel Produce, Inc.*, 18 Civ. 6947, 2019 WL 4303423, *3-*4 (S.D.N.Y. Sept. 11, 2019). On appeal, Eliran, who was neither an owner nor an officer of Orel, contends that summary judgment was inappropriate because there are genuine issues as to whether he had such control. We conclude that partial summary judgment was appropriate with respect to $40,000 of PACA trust assets that were placed in Eliran's personal bank account, but that whether he had the necessary degree of control over other assets could not be resolved as a

matter of law.  Accordingly, we vacate the judgment in part and remand for trial of the issue of Eliran's control over other Orel assets.

Affirmed in part, vacated in part, and remanded.

GREGORY A. BROWN, Melville, New York (McCarron & Diess, Melville, New York, on the brief), *for Plaintiffs-Appellees*.

MARK F. HEINZE, Hackensack, New Jersey (Ofeck & Heinze, Hackensack, New Jersey, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Eliran Yadid ("Eliran" or "E. Yadid") appeals from so much of a judgment of the United States District Court for the Southern District of New York, Paul A. Crotty, *Judge*, as orders him, jointly and severally with his codefendants Orel Produce, Inc. t/a Moses ("Orel"), and Moshe Yadid ("Moshe" or "M. Yadid"), to pay plaintiffs, suppliers of perishable goods, a total of $606,664.87, including principal unpaid amounts totaling $473,268.82, plus interest and attorneys' fees, by reason of Orel's failure to pay plaintiffs for goods purchased, and defendants' dissipation of the statutory trust imposed on Orel's assets for the benefit of unpaid suppliers, in violation of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.*  The court granted plaintiffs' motion for summary judgment holding Eliran liable on the ground that he was a person in control of the

3

trust assets. On appeal, Eliran, who was neither an owner nor an officer of Orel, contends that summary judgment was inappropriate because there exist genuine issues of fact as to whether he had such control. We conclude that partial summary judgment was appropriate with respect to $40,000 of PACA trust assets that were placed in Eliran's personal bank account, but that whether he had the necessary degree of control over other assets could not be resolved as a matter of law. Accordingly, we vacate so much of the judgment as held Eliran liable for an amount in excess of $40,000, and remand for trial of the issue of his control over other Orel assets.

# I. BACKGROUND

Most of the facts leading to this lawsuit are not in dispute. Plaintiffs S. Katzman Produce Inc. *et al.* (collectively the "Katzman Companies" or "Katzman") are licensed interstate suppliers of perishable fruits and vegetables. Orel, until it ceased operations in the summer of 2018, was a wholesale distributor of fruits and vegetables, subject to license under PACA. Orel was wholly owned by Moshe, who was its only officer. Eliran is Moshe's son.

4

In February-July 2018, Orel purchased from the Katzman Companies wholesale quantities of produce worth more than $516,000, for most of which Orel failed to pay. In August 2018, Katzman, having previously preserved rights in accordance with PACA, commenced the present action against Orel, Moshe, and Eliran, principally alleging violations of PACA, which, in pertinent part (*see* Part II.A. below), requires dealers in perishable agricultural commodities to make full payment to their suppliers promptly, or to maintain the proceeds or receivables from such commodities in trust for the suppliers until full payment has been made.

Following a period of discovery, in which neither side conducted depositions, Katzman moved for summary judgment. Defendants conceded Orel's liability; and an initial dispute as to the amount Orel owed was resolved. *See S. Katzman Produce, Inc. v. Orel Produce, Inc.*, 18 Civ. 6947, 2019 WL 4303423, *1 & n.1, *3, *5 (S.D.N.Y. Sept. 11, 2019) ("*S. Katzman*"). It was also "[n]ot disputed" that "*[a]t all relevant times*, defendant *Moshe Yadid is and was the sole shareholder and officer of [Orel]*, and is and was in a position of control over the PACA trust assets belonging to Plaintiffs." (Plaintiffs' and Defendants' Rule 56.1 Statements ¶ 15 (emphases ours).) Accordingly, neither the district court's grant of summary judgment against Orel and Moshe nor the amount of the judgment is at issue here.

A. *Katzman's Motion for Summary Judgment Against Eliran*

Notwithstanding plaintiffs' assertion that "[a]t all relevant times . . . Moshe" was Orel's "*sole* shareholder and officer" (Plaintiffs' Rule 56.1 Statement ¶ 15 (emphasis added))--which defendants did not dispute--plaintiffs sought judgment against Eliran on the ground that "[a]t all relevant times . . . *Eliran* . . . is and *was an officer*, director *and/or shareholder* of [Orel]" (*id*. ¶ 12 (emphases added)), contending that "Eliran" was thus "in a position of control over the PACA trust assets belonging to Plaintiffs" (*id*.). Eliran denied the ¶ 12 assertions. (*See* Defendants' Rule 56.1 Statement ¶ 12.) Evidence was adduced on both sides.

1. *Plaintiffs' Evidence*

In support of their motion for summary judgment against Eliran, plaintiffs submitted, *inter alia*, documents received in discovery from Orel's bank (*see* Declaration of Gregory Brown, counsel for Katzman, dated February 1, 2019 ("Brown Declaration"), ¶ 3), including the following:

> a. The bank signature cards for [Orel] which identifies [*sic*] M. Yadid and E. Yadid as signatories on [Orel's] bank account . . . . The bank signature cards indicate that M. Yadid has been a signatory on the account since September 13, 2016 and *E. Yadid has had signing authority since December 7, 2016*;

6

. . . .

  c. *Checks drawn on [Orel's] bank account signed by E. Yadid as payment to [Orel's] produce suppliers including Katzman Produce*, Fierman Produce Exchange Inc., D'Arrigo Bros. of NY Co., Inc. and Fruitco Corp. . . .;

  d. *Checks* drawn on [Orel's] bank account *signed by E. Yadid and payable to E. Yadid* on a semi-weekly basis, presumably as salary. . . . ;

  e. *Cash* withdrawal receipts reflecting *withdrawals made by E. Yadid* from [Orel's] bank account. . . . ;

  f. Bank statements reflecting all transactions into and out of [Orel's] account. . . . The statement reflects *an electronic transfer to an account held by E. Yadid on July 27, 2018 in the amount of $40,000.00.* Plaintiffs filed this action on August 2, 2018.

(Brown Declaration ¶¶ 3(b) and 3(c)-(f) (emphases added), attaching Exhibits H and J-M.)

In addition, the Brown Declaration stated that counsel's investigation had "revealed other documents and things which reflect the role E. Yadid . . . had in controlling the operations of [Orel]," including

  [a]n equipment financing agreement entered into between Orel Produce Inc. and Phoenix Rising Corp. which *identifies E. Yadid as [Orel's] owner* and in connection with which both E. Yadid and M. Yadid guaranty [*sic*] the debt incurred in [Orel's] name.

(*Id*. ¶ 4(b) (emphasis added), attaching Exhibit O.)

2. *Eliran's Response*

In opposition to plaintiffs' motion insofar as it related to him, Eliran submitted a sworn declaration stating, *inter alia*, that his father Moshe "was the owner and the boss" of Orel and that Moshe "controlled the company." (Declaration of Eliran Yadid dated March 6, 2019 ("Eliran Decl."), ¶ 18).  He cited to Orel's tax returns for 2016 and 2017, excerpts of which were produced by defendants, "show[ing] that Moshe was the 100% shareholder of the company."  (*Id*. ¶ 10.) Describing his own role in the company, Eliran stated

> I was never an owner of [Orel], I did not manage or operate the company, and I had no authority or control over its assets and finances, including the products purchased by [Orel] from the plaintiffs.

> 4.  I did not ever receive any share of the profits or losses of the company, or any dividends or distributions. I only received salary . . . .

(*Id*. ¶¶ 3-4.)  Eliran stated that, in 2011, he reached the age of 21 and received his GED, and Moshe asked him to help in the business; Eliran then worked for "[his]

8

father on-and-off from 2011 until the business closed in the summer of 2018." (*Id.* ¶¶ 15-16, 21.) As to how Orel was run, Eliran stated that his own

> work was part-time, and generally involved running errands and simple administrative tasks, such as opening the mail, making deposits and the like.
>
> 17. *I was not given any authority to make decisions for the business, and I took my instructions from Moshe.*
>
> 18. He was the owner and the boss, and he controlled the company.
>
> 19. He was the only buyer of produce from Katzman (and any other suppliers) and he was the primary point of contact with the customers.
>
> 20. He made all decisions about the company's inventory and finances.

(*Id.* ¶¶ 16-20 (emphasis added).)

Eliran said that for about a two-year period from late 2014 until late 2016, he had mental health problems and other interests and did not work for Orel. (*See id.* ¶¶ 22-28.) He stated that he had suffered "clinical depression," for a time "was refusing treatment," and for three weeks was hospitalized for "a psychiatric episode." (*Id.* ¶¶ 25, 27.) He stated that, from prior to 2011 through the present, he

9

has been "under the continuous treatment of a physician" and is "regularly taking psychiatric medication." (*Id*. ¶ 22.)

Eliran resumed working for his father at Orel in late 2016. He stated that

> [a]s before, I worked under the direction of Moshe. *He continued to make all decisions* and he had total control over the company and its property.
>
> 31. During this last period of my employment at [Orel], my father directed that I be added as a signatory to the [Orel] checking account at JP Morgan Chase.
>
> 32. *There was no benefit to me for doing this*, and *it was my father's decision*.
>
> 33. He told me that he wanted me to be available to sign checks, in case he was not around and check [*sic*] needed to be signed right away.

(*Id*. ¶¶ 30-33 (emphases added).)

Eliran said that he has no memory of specific transactions in which he signed checks, but that the checks he reviewed from the pretrial discovery documents were in relatively small amounts, ranging from $105 to $1,525, and were "routine payments to suppliers" that Moshe "would have told [Eliran] to pay, probably because [Moshe] was not available to sign at the time." (*Id*. ¶¶ 34-35.)

Eliran said, "[t]he decision to make these payments was not mine"; that Moshe "continued to be the signer of the large majority of checks, including all checks to Katzman"; and that Moshe "always took care of this, deciding when and how much to pay. This was none of my business." (*Id*. ¶¶ 35-37.) Eliran said he signed his own salary checks--$569.12 a week--as instructed by his "father Moshe," who "determined how much [Eliran] would be paid," and that Eliran

> never received profits, dividends or other distributions based on the financial performance of the company.
>
> 41. *I was not permitted to make any financial decisions, and I did not do so.*

(*Id*. ¶¶ 39-41 (emphasis added).)

Eliran said he attended some meetings with his father, including meetings with Katzman to discuss the account, because "Moshe has limited ability with the English language." (*Id*. ¶ 13; *see id*. ¶ 52.) But he said his role in those meetings was to "assist[ his] father with translation, . . . not [to be] a principal or a decision-maker at these meetings." (*Id*. ¶ 53.)

As to the documents discovered by plaintiffs showing that Eliran had signed an Orel truck lease document stating that he "was an 'owner' of Orel," Eliran stated:

I realize now that I should not have done this. It was not accurate for me to say that I was an "owner", when I was not.

(*Id*. ¶¶ 42-43.)

And as to the $40,000 that in late July 2018 "was wired from the Orel account to [Eliran's] personal account," Eliran said:

[t]his was my father's decision and not mine. The funds were wired to my account because my father does not have his own bank account.

47. I did not receive any personal benefit from these funds, including several salary payments still owed to me.

48. My father determined how this money would be used. He directed me to make payments for his rent, car payments and other expenses, and for certain payment [*sic*] due from [Orel], including truck payments.

(*Id*. ¶¶ 45-48.)

3. *Plaintiffs' Reply*

In reply to Eliran's denial of any managerial role in the operations of Orel, plaintiffs submitted a declaration from Katzman comptroller Gary Allen attaching copies of text messages exchanged between himself and Eliran from April 27 through July 30, 2018, with regard to payments Orel was to make to Katzman. Allen stated that the messages from Eliran did not suggest that Moshe was the sole

decisionmaker but rather referred to Orel's actions or decisions in terms of "'we'" or "'I'" (Reply Declaration of Gary Allen dated March 21, 2019 ("Allen Reply Decl."), ¶ 5); that Eliran arranged a May 22, 2018 meeting with Katzman that was not attended by Moshe (*see id.* ¶ 7); that Eliran himself made requests that Katzman delay depositing certain checks Orel had sent (*see id.* ¶ 6); that Eliran requested that Katzman send its bills directly to Eliran (*see id.* ¶ 9); that Eliran could access Orel's bank account and do transactions on his own phone (*see id.*); and that Eliran himself was attempting to negotiate a loan for Orel (*see id.* ¶ 8).

B. *The District Court's Ruling as to Eliran's PACA Liability*

The district court ruled that plaintiffs were entitled to summary judgment with regard to Eliran's liability under PACA, finding that the "evidence submitted by Plaintiffs demonstrating E. Yadid's authority to direct control of Orel's assets" was "overwhelming." *S. Katzman*, 2019 WL 4303423, at *3. The court found that the

> record establishes that E. Yadid had check signing authority for Orel, signed checks payable to Orel'[s] produce suppliers, *paid himself a weekly salary, withdrew cash from Orel'[s] bank accounts, made distributions to himself* using PACA trust funds in Orel'[s] bank accounts, . . . *described himself as an "owner" of Orel on a truck loan application*[,] . . . *personally guaranteed the truck loan debt*[,] . . . .

13

[and] for at least three months in 2018, presumably as Orel's debts began to mount, . . . *maintained near-daily text message contact with [the Katzman Companies'] controller as he attempted to work out Orel's debts.*

Beyond their frequency, E. Yadid's messages with Plaintiff's controller also reveal his intimate knowledge and decision-making authority regarding Orel's finances. E. Yadid knew when checks drawn on Orel's accounts were likely to clear and when funds received by Orel would become available. . . . He also participated in *meetings* on behalf of Orel, *without his father present*, to make financial arrangements for the Company, and *applied for a loan on behalf of Orel, overseeing the distribution of the loan proceeds* . . . . The messages further show E. Yadid seeking copies of Plaintiffs' invoices (which contained the PACA trust language), taking part in the collection of Orel's accounts' receivable, and regularly conducting financial transactions from Orel's bank accounts, including over his mobile phone.

*Id*. at *3-*4 (record citations omitted; emphases ours).

The court stated that the evidence proffered by defendants, "a sworn declaration by E. Yadid and two incomplete portions of Orel's tax returns from 2016 and 2017," failed "[t]o rebut this overwhelming showing of E. Yadid's authority and control." *Id*. at *4.

Although the 2016 and 2017 tax returns demonstrate that E. Yadid did not have stock or formal interest in Orel, this fact is not material to the PACA control inquiry. . . .

E. Yadid's declaration, riddled with conclusory allegations or unsubstantiated speculation, . . . fares no better. E. Yadid's

14

*conclusory statement that he "was not permitted to make any financial decisions*, and [] did not do so" *does not rebut the overwhelming contrary evidence showing his near-daily management of Orel's bank accounts and finances*, dating back to at least April 2018. Similarly, although E. Yadid states that he was only present at meetings with Plaintiffs in his capacity as his father's interpreter, this statement is contradicted by text messages he sent on May 21, 2018 and May 22, 2018 which show him coordinating to meet with Plaintiffs on his own. *E. Yadid's effort to justify calling himself Orel's owner on a truck leasing agreement as erroneous and "not accurate," is similarly unsupported by anything in the record.*

*Id.* (footnote, record citations, and other internal quotation marks omitted (emphases ours)).

After dismissing Eliran's descriptions of his past mental health problems as mere "[d]istractions" from the issues, the court stated that the "uncontested" "key facts demonstrat[ed] E. Yadid's control over the PACA assets," pointing to the evidence that Eliran "received a salary from Orel, had check signing authority on Orel's bank accounts, authorized cash withdrawals and electronic transfers from those accounts, [and] described himself as Orel's owner and personally guaranteed Orel's debt." *Id.* (record citations omitted).

The court concluded that Eliran was liable under PACA and entered judgment holding him jointly and severally liable with Orel and Moshe for the $606,664.87 awarded to plaintiffs.

15

II. DISCUSSION

On appeal, Eliran contends that there were genuine issues of fact to be tried as to whether he had sufficient control of Orel's assets to make him liable for misuse of PACA trust assets, and that summary judgment was thus inappropriate. Except to the extent that the court's ruling applied to the transfer from Orel to Eliran's bank account of $40,000, we agree.

A. *PACA*

As discussed in several of our prior decisions, *see*, *e.g.*, *Coosemans Specialties, Inc. v. Gargiulo,* 485 F.3d 701, 705 (2d Cir. 2007) ("*Coosemans*"); *"R" Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.,* 467 F.3d 238, 241-42 (2d Cir. 2006) ("*"R" Best v. Shulman*"); *D.M. Rothman & Co. v. Korea Commercial Bank of New York*, 411 F.3d 90, 93-94 (2d Cir. 2005) ("*D.M. Rothman*"); *American Banana Co. v. Republic Nat'l Bank,* 362 F.3d 33, 36-38 (2d Cir. 2004) ("*Am. Banana*"), *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1066-67 (2d Cir. 1995) ("*Endico Potatoes*"), PACA was enacted in 1930 "to regulate the interstate sale and marketing of perishable agricultural commodities," with a view to protecting growers and sellers of

agricultural produce "against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables," *Coosemans*, 485 F.3d at 705 (internal quotation marks omitted).

1. *The PACA Trust*

In the early 1980s, Congress reexamined PACA in the wake of a sharp increase in defaults among buyers, and decided that sellers needed additional protection. *See* H.R.Rep. No. 98-543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406. Because of the perishable nature of the goods being sold, sellers often found themselves in the position of unsecured creditors of buyers whose creditworthiness could not be verified. *If defaults occurred, sellers could look only to the commodities, which would have already perished.* As unsecured creditors, they typically stood in line behind banks and other lenders who had obtained security interests in the defaulting purchaser's inventories and receivables. *See Am. Banana*, 362 F.3d at 37.

To relieve the burden on sellers, Congress amended PACA in 1984 by *adding § 499e(c)*, which *requires dealers . . . to hold sales proceeds "in trust for the benefit of all unpaid suppliers or sellers of such commodities[,]"* 7 U.S.C. § 499e(c)(2)[,] . . . . "*until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers.*" *Id.*; *see Am. Banana*, 362 F.3d at 37-38.

*"R" Best v. Shulman*, 467 F.3d at 241 (emphases ours). The added § 499e(c) "defines the corpus of the trust as all produce received from sellers, including 'all inventories

17

of food or other products derived from' the produce, 'and any receivables or proceeds from the sale of such' produce or its derivative products." *"R" Best v. Shulman*, 467 F.3d at 241 (quoting 7 U.S.C. § 499e(c)(2)). However, PACA trust assets may be commingled with the dealer's other assets "without defeating the trust." *Endico Potatoes*, 67 F.3d at 1067:

> Trust assets are to be preserved as a nonsegregated "floating" trust. Commingling of trust assets is contemplated.

7 C.F.R. § 46.46(b).

Suppliers who have given the required "notice of intent to preserve trust benefits," *id*. § 46.46(f); *see* 7 U.S.C. § 499e(c)(3)-(4), "may file trust actions against licensees and persons operating subject to license," for "dissipation of [PACA] trust assets," 7 C.F.R. § 46.46(d)(1). "Dissipation" is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." *Id*. § 46.46(a)(2). We interpret dissipation to include the use of "'the trust assets for *any purpose other than repayment of the supplier*,' including the use of trust assets for 'legitimate business expenditures, such as the payment of rent, payroll, or utilities,'" *Coosemans*, 485 F.3d at 707 (quoting

18

*Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346, 348 (S.D.N.Y. 1993) ("*Okun*") (emphasis in *Coosemans*)). *Accord Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163, 167-68 (3d Cir. 2010) ("*Bear Mountain*"); *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 594-95 (4th Cir. 2010) ("*Nickey Gregory*"); *Hiller Cranberry Prod., Inc. v. Koplovsky*, 165 F.3d 1, 7-9 (1st Cir. 1999) ("*Hiller Cranberry*"); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997) ("*Sunkist Growers*"); *Six L's Packing Co. v. Beale*, 524 F. App'x 148, 152 (6th Cir. 2013) ("*Six L's*").

2. *Individual Liability*

Although PACA does not expressly provide that an individual may be held liable for a dissipation of PACA trust assets, we and other courts have held that the trust created by PACA is governed by general trust principles, unless those principles directly "conflict[] with the PACA statute," *D.M. Rothman*, 411 F.3d at 94; *Nickey Gregory*, 597 F.3d at 595 (same); *see, e.g.*, *Endico Potatoes*, 67 F.3d at 1067; *Bear Mountain*, 623 F.3d at 167-68; *Sunkist Growers*, 104 F.3d at 282-83; *Hiller Cranberry*, 165 F.3d at 8-9; *Six L's*, 524 F. App'x at 156. Under traditional trust principles,

> "[a]n individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that

19

tortious act. . . . [A] PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier."

*Sunkist Growers*, 104 F.3d at 283 (quoting *Okun*, 814 F.Supp. at 348); *see also D.M. Rothman*, 411 F.3d at 94 (noting that PACA's allowed commingling of PACA trust assets with other company assets is a deviation from general trust principles).

Given the applicability of traditional trust principles, under PACA "[a]n individual who is in a position to control the assets of the PACA trust and fails to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary duty." *Coosemans*, 485 F.3d at 705; *see, e.g.*, *Hiller Cranberry*, 165 F.3d at 8-9 ("An individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act." (internal quotation marks omitted)); *Sunkist Growers*, 104 F.3d at 283.

Although in most of the cases to address such a personal liability claim the individual defendants have in fact been the shareholders or officers of the dealer, the dispositive focus has generally been on whether the individual had control over the preservation or disposition of the dealer's assets. *See, e.g.*, *Coosemans*, 485 F.3d

20

at 709 (affirming summary judgment on PACA claim against the president, sole shareholder, and sole director of the seller "because [he] was in a position of control over the PACA trust assets and dissipated those assets"); *Sunkist Growers*, 104 F.3d at 283 ("If the seller's assets are insufficient to satisfy the liability, others may be found secondarily liable if they had some role in causing the corporate trustee to commit the breach of trust." (internal quotation marks omitted)); *Golman-Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000) ("*Golman*") ("individual shareholders, officers, or directors of a corporation *who are in a position to control trust assets*, and who breach their fiduciary duty to preserve those assets, may be held personally liable under PACA" (emphasis added)); *Hiller Cranberry*, 165 F.3d at 9 (reversing district court's finding that suppliers were not likely to succeed on PACA claims against the dealers' sole owner who "exercise[d] pervasive control" over the dealers).

While this Court has not previously confronted directly the question of whether secondary PACA liability could be imposed on an individual who was not an owner, officer, or director of the PACA dealer, we have at least suggested that that possibility exists, *see "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 125 & n.8 (2d Cir. 2008) ("*DiSapio*"). *DiSapio* came to us on appeal from the denial of

21

reconsideration of a refusal to vacate a default judgment entered against the son of two owners of PACA dealers; the appeal directly presented only questions of appellate jurisdiction, default judgments, and personal jurisdiction. However, we concluded that the claim that the default judgment should have been vacated for lack of personal jurisdiction raised unresolved factual issues as to the relationship of the son to the corporations.

The suppliers contended that the son was an officer and director of the dealer corporations and had ordered produce from them and assured them that they would be paid. The son submitted an affidavit stating that at all relevant times he had been merely a salaried employee of the corporations, earning $900 a week; that he had never been an officer, director, or stockholder of the corporations, nor signed checks for the corporations; and that he had never undertaken to be personally responsible to pay the invoices of the plaintiff or any other supplier. We remanded for resolution of the conflicting factual assertions, while noting that "cases in which an individual defendant has been subjected to PACA liability . . . have involved a sole shareholder or an officer/director." *DiSapio*, 540 F.3d at 125 n.8 (citing *Coosemans*, *Golman*, and *Okun*). We "assume[d], for purposes of" the appeal before us, that the corporation's consent to personal jurisdiction could be imputed to the

22

son "if the facts, properly found, show that the son is personally liable under the PACA." *DiSapio*, 540 F.3d at 125; *see also Six L's*, 524 F. App'x at 156 ("[n]othing in . . . previous [Sixth Circuit] decisions suggests that we should extend PACA-liability to individuals who are not shareholders, officers, or directors of a corporation").

The proposition that one who is not an owner, officer, or director of the dealer may nonetheless have secondary PACA liability if he had control over the dealer's dissipated assets is consistent with the general principle applied in the cases discussed above, and Eliran does not argue that the standard is or should be different. Rather, he contends merely that, as to whether he had sufficient control of Orel to impose PACA liability on him personally, the record revealed genuine issues of fact to be tried and thus was insufficient to warrant summary judgment.

B. *Summary Judgment Principles*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). In determining whether the moving party is entitled to judgment as a matter of law--whether by summary judgment, or by a

23

motion for judgment as a matter of law during or after trial, *see, e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("*Reeves*") ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) ("*Liberty Lobby*"))--the district court may not properly consider the record in piecemeal fashion; rather, it must "review all of the evidence in the record," *Reeves*, 530 U.S. at 150.  And in reviewing the evidence, the court must resolve all ambiguities in favor of the nonmoving party, *see, e.g., Liberty Lobby*, 477 U.S. at 250; "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *id*. at 255, "even though contrary inferences might reasonably be drawn," *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962)).

In addition, in reviewing the evidence and considering what inferences may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence. . . .  'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Reeves*, 530 U.S. at 150 (quoting *Liberty Lobby*, 477 U.S. at 255).

An affidavit or declaration submitted to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory. *See, e.g., ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir.), *cert. denied*, 552 U.S. 827 (2007); *McPherson v. New York City Department of Education*, 457 F.3d 211, 215 n.4 (2d Cir. 2006); *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). However, "it is ordinarily impossible to state all of the facts that show that an event never occurred," and "an attempt to give a detailed recitation of what did happen, without a conclusory denial, may well leave a negative pregnant," *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998). Thus, a conclusory statement that an event has not occurred, from a party having personal knowledge, may be sufficient to forestall summary judgment. *See, e.g., SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138-40 (2d Cir. 2009) (affidavit stating that, to the affiant's knowledge, a particular debt had not been paid, although conclusory, was sufficient to create "a genuine issue of material fact as to whether" that debt "had been paid in full"); *Bellamy v. City*

25

*of New York*, 914 F.3d 727, 745-47 (2d Cir. 2019) (the plaintiff's deposition testimony that "he never made the statement" that the defendant attributed to him was "sufficient to raise a genuine issue of material fact"); *cf. United States v. Mathurin*, 148 F.3d at 70 ("although conclusory, [the accused's affidavit] stat[ing] that he was never given *Miranda* warnings was sufficiently factual and specific to require an evidentiary hearing").

"We review the district court's grant of summary judgment *de novo*, applying the same standards that govern the district court's consideration of the motion." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see, e.g.*, *Aulicino v. New York City Department of Homeless Services*, 580 F.3d 73, 79 (2d Cir. 2009); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).

C. *Eliran*

With these principles in mind, we conclude that the district court's granting of summary judgment against Eliran was appropriate only with respect to the $40,000 transferred to his account shortly before Orel ceased business.

26

1. *The $40,000*

There is no dispute that on July 27, 2018, near the end of defendants' negotiations with Katzman about Katzman's unpaid invoices, $40,000 was wired from Orel's account to Eliran's personal bank account. Eliran's explanations that that transfer was made on the instruction of Moshe and that Moshe gave directions for the money's use, cannot alter the fact that upon the arrival of the $40,000 in Eliran's account, those funds--whether or not he had any control of them earlier--were under Eliran's control. Indeed, the record does not suggest that anyone other than Eliran could make payments from his account.

Eliran's representation that he did not personally benefit from those funds does not spare him from PACA liability. The money had automatically become part of the PACA trust held by Orel. Even if the money, after transfer to Eliran's account, had been entirely used for "[Orel's]" own expenses including its "truck payments" (Eliran Decl. ¶ 48)--and by Eliran's own statement its use was not so limited (*see id*. (the money was to be used in part "for [Moshe's] rent, car payments, and other expenses"))--so long as Katzman had not been fully paid, disbursement of that money to any other entity constituted, as a matter of law (*see* Part II.A.1. above), a dissipation of PACA trust assets.

27

As Eliran indisputably had control of Orel's $40,000 after it was wired to his personal account, we conclude that judgment against Eliran was proper to the extent of $40,000.

2. *The Remainder of Orel's Assets*

As to the remainder of the sums due Katzman, the record presents fact issues as to whether Eliran had control of Orel's other assets and operations. Despite the principles discussed in Part II.B. above, the district court, in concluding that Eliran had such control, disregarded or discredited some of Eliran's sworn statements of fact, refused to draw permissible inferences in his favor, and engaged in a weighing of the evidence.

First, we think it clear that the court engaged in a weighing of the evidence. It stated that "E. Yadid's conclusory statement that he 'was not permitted to make any financial decisions, and [] did not do so' . . . *does not rebut* the overwhelming contrary evidence showing his near-daily management of Orel's bank accounts and finances, dating back to at least April 2018," *S. Katzman*, 2019 WL 4303423, at *4 (quoting Eliran Decl. ¶ 41 (emphasis ours)).

28

Second, in disparaging this statement by Eliran as conclusory, the court ignored both its content and its context. A truly conclusory assertion would have been simply an unexplained "I did not have control over [Orel's] assets." Eliran, however, specified the type of authority he was not given, *i.e.*, making "financial" decisions (Eliran Decl. ¶ 41; *see also id*. ¶¶ 3, 17, 20, 30). And Eliran set out affirmative factual context for that denial, stating, *inter alia*, that Moshe was Orel's owner, that Moshe was the boss, and that all of the decisions were made by Moshe; that Moshe was the primary point of contact with Orel's customers and that Moshe made all of the decisions about Orel's inventory and finances; and that Moshe was Orel's only buyer, that "95% or more" of the produce Orel sold was bought from Katzman, that Moshe decided how much to pay Katzman and decided when to pay it, and that all checks to Katzman were signed by Moshe (*id*. ¶¶ 6, 17-20, 35-37). Eliran stated that he worked under the direction of Moshe, was given authority to sign Orel checks for the convenience of Moshe, and performed the duties given him by Moshe as directed by Moshe. (*See id*. ¶¶ 17, 30-33, 35.)

Thus, while Eliran's statement in ¶ 41 as to his lack of authority was to an extent conclusory in form, it was specific as to the type of decisions he was not permitted to make and was accompanied by affirmative statements as to who had

29

the authority to make those decisions and how it was exercised with respect to at least 95% of Orel's business. Viewed in context, Eliran's statements, based on his own personal experience, were sufficiently factual and specific. The district court, in ruling on a motion for summary judgment, could not properly reject Eliran's contention that he did not have control of Orel's assets by considering his ¶ 41 statement in isolation; the court was required to consider Eliran's related factual assertions, and was required to draw in Eliran's favor all reasonable inferences that a jury would be permitted to draw.

Further, while the district court acknowledged that it was required to resolve all ambiguities in favor of Eliran as the party against whom summary judgment was being sought, it plainly did not do so. The court found that Eliran had control of Orel's assets because it found certain "key" facts "uncontested." *S. Katzman*, 2019 WL 4303423, at *4. The very first "key" fact cited by the court was that Eliran "received a salary." *Id*. But receiving a salary is at best ambiguous as to whether the salaried person is in control of the company. Yet the district court impermissibly drew from this at-best ambiguous fact an inference against Eliran. The court perhaps decided that there was no ambiguity because the court found that Eliran "paid himself" the salary, *S. Katzman*, 2019 WL 4303423, at *3. But that

characterization of the record is contrary to Eliran's sworn statements that Moshe determined what salary Eliran would be paid and that Moshe authorized Eliran to sign his own salary checks as a matter of convenience (*see* Eliran Decl. ¶¶ 38, 39). The court did not acknowledge Eliran's statements that his salary was determined by his father and that his father permitted him to sign the salary checks as a matter of convenience. Similarly, other "key" facts cited by the district court as "uncontested" and as demonstrating Eliran's control over Orel's assets, *e.g.,* that Eliran "had check signing authority on Orel's bank accounts . . . and authorized cash withdrawals and electronic transfers from those accounts," *S. Katzman*, 2019 WL 4303423, at *4, were also relied on by the court without reference to Eliran's explanations that his authority to perform those functions was limited by Moshe, from whom he took instructions. It is not clear whether the court found Eliran's statements insufficiently persuasive or instead simply did not believe them; but either was inappropriate, as assessments of credibility and choices between conflicting versions of the facts are matters for the jury, not for the court on a motion for summary judgment.

With respect to the aspects of Eliran's performance of his duties that the district court termed "key" and "uncontested" facts showing Eliran's control of Orel,

the district court stated that "[c]ourts in this Circuit have consistently found *such evidence sufficient* to impose individual liability under PACA," *S. Katzman*, 2019 WL 4303423, at *4 (emphasis added).  However, on a motion for summary judgment-- and especially as to issues on which, as here, the movant has the burden of proof-- the question is not whether the movant's evidence is "sufficient" but rather whether there are material factual disputes that prevent the grant of judgment to the movant as a matter of law and instead require a trial.  None of the three cases relied on by the district court resembles the grant of summary judgment against Eliran on the record in this case:  In *A & J Produce Corp. v. Borough Park Food Mart LLC*, No. 17-CV-2337, 2018 WL 566458 (S.D.N.Y. Jan. 25, 2018), summary judgment was granted against defendants who did not oppose the plaintiff's motion, *see id*. at *1, *3. In *Mid-Valley Produce Corp. v. 4-XXX Produce Corp.*, 819 F. Supp. 209 (E.D.N.Y. 1993), the court granted summary judgment in favor of suppliers that were owed $185,012.32 for purchases in 1991 on uncontested facts quite different from those here, in that the individual defendant held liable did not dispute, *inter alia*, that he had been the president of the retailer since at least June 1991; that he was paid salary and commissions totaling approximately $150,000 in 1991; and that in 1991 he signed checks totaling $113,000 payable to a corporation wholly owned by himself

32

and his sister, *see id*. at 210-13. And in *DiMare Homestead, Inc. v. Alphas Co. of New York*, No. 09 CIV. 6644 PKC, 2012 WL 1155133, at *1 (S.D.N.Y. Apr. 5, 2012), *aff'd*, 547 F. App'x 68 (2d Cir. 2013), the court found defendants individually liable only after a trial.

The strongest facial evidence that Eliran had control of Orel's assets is the fact that in signing a truck lease for Orel in 2017 Eliran listed himself as Orel's "owner," and the district court listed this among its "key" facts showing Eliran's control. Eliran stated in his declaration that he "should not have" called himself an "owner . . . . *It was not accurate for me to say that I was an 'owner', when I was not*." (Eliran Decl. ¶¶ 42-43 (emphasis added).) The district court apparently rejected even this assertion, stating that Eliran's attempt "to justify calling himself Orel's owner," *S. Katzman*, 2019 WL 4303423, at *4, was "unsupported by anything in the record," *id*. But Eliran did not attempt to "justify" calling himself Orel's "owner"; he stated expressly that that was not accurate; and its inaccuracy is in fact supported throughout the record: by the 2016 and 2017 tax returns showing that Moshe was Orel's 100% owner, by both sides' Rule 56.1 Statements ¶ 15 stating that at all relevant times, Moshe was Orel's sole shareholder, and by the district court's own

finding that "Moshe Yadid . . . was, at all times relevant to this action, the Company's sole . . . shareholder," *id*. at *1.

The only statements by Eliran that the district court expressly stated that it accepted "as true" were Eliran's descriptions (*see* Eliran Decl. ¶¶ 22-29) of his past and continuing problems with his mental health, *S. Katzman*, 2019 WL 4303423, at *4 n.2. However, the court found these problems to be "immaterial," because it found that Eliran's authority at Orel "during the relevant time period . . . appeare[d] to have increased substantially." *Id*. We have difficulties with both of these views.

First, in inferring that Eliran's control of Orel had increased, the court referred principally to Eliran's "near-daily text message contact with [Katzman's] controller as he attempted to work out Orel's debts," *S. Katzman*, 2019 WL 4303423, at *3. But while those messages showed that Eliran deposited incoming checks into Orel's bank account and wired money to Katzman, and that he was closely tracking the pace of customer deposits into Orel's account and attempting to slow the depositing of checks against that account, the texts themselves are susceptible to competing inferences as to whether Eliran was acting on his own authority or whether Moshe remained in full control and Eliran was simply following instructions from his father. For example, some texts from Allen to Eliran included

34

references to decisions that Allen and Moshe had made with respect to depositing or replacing checks, decisions of which Eliran appeared to be unaware. And the texts reveal Allen's insistence on talking to Moshe. (*See*, *e.g.*, Allen Reply Decl. Exhibit A (June 12: "*When are you **and your dad** coming in*"; June 20 [#1]: "*When can u **and ur dad** come in tonight*"; June 20 [#2]: "***Ur father must be here also***"; June 20 [#3]: "*Both u **and ur father** will be here tonight at 4:30?*"; and June 20 [#4], after Eliran reports that his father cannot meet that day and they agree to meet on June 25, with Eliran asking at what time, Allen's response is "*Whenever **both** of u can attend.*" (emphases added)).) And on July 30, Allen texted Eliran: "***Have ur father call me now.***" (*Id.* (emphasis added).) Allen's persistent requests for Moshe's presence lend support to Eliran's statements that Eliran himself "was not given any authority to make decisions for the business" (Eliran Decl. ¶ 17; *see id.* ¶ 30) and that all such decisions were made by Moshe. The district court's finding that Eliran had control of Orel's assets during the relevant period based on his constant contacts with Allen did not draw permissible inferences that favored Eliran.

Finally, we cannot agree with the district court that Eliran's accepted-as-true evidence as to his mental health problems, which he stated were continuing, was immaterial to the factual issue of whether Eliran had control of Orel's assets. A

35

jury would be entitled to credit Eliran's testimony that he was not authorized to make any business decisions, and to find that plaintiffs had not carried their burden of proving it more likely than not that Moshe gave his mentally troubled son control of his business.

We conclude that with respect to the bulk of Orel's assets, the issue of control by Eliran could not be decided as a matter of law.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. The district court's ruling that Eliran as a matter of law is responsible for dissipation of $40,000 of Orel's assets is affirmed. To the extent that the court granted summary judgment against Eliran and found him jointly and severally liable on the judgment in favor of plaintiffs beyond that $40,000 amount, the judgment is vacated, and the matter is remanded to the district court for trial of the issues as to whether Eliran had sufficient control of Orel's assets to impose on him secondary liability under PACA.